UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **STEPHANIE MCKNIGHT** | **CIV. ACTION NO. 07-0030** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **MADISON PARISH SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

This is a lawsuit brought by Plaintiff Stephanie McKnight ("McKnight") against the Madison Parish School Board ("the School Board") on the basis of alleged actions that took place during her employment with the School Board. McKnight contends that she was subjected to sexual harassment, race discrimination, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and negligent and intentional infliction of emotional distress, assault, and battery in violation of state law. She further contends that the School Board is liable to her under state law because of its negligent hiring, supervision, and retention of former Superintendent Michael Johnson ("Johnson").

Pending before the Court is a Motion for Summary Judgment [Doc. No. 90] filed by the School Board, seeking dismissal of all McKnight's claims. McKnight has filed an opposition [Doc. No. 98] and, with leave of Court, a supplemental opposition [Doc. No. 102] to the School Board's Motion for Summary Judgment. McKnight did not submit any evidence in support of her opposition and supplemental opposition.

For the following reasons, the School Board's Motion for Summary Judgment is GRANTED.

1

I.   **FACTS AND PROCEDURAL HISTORY**

McKnight was employed as a teacher by the School Board, beginning in 2003.

During the 2005-2006 school year, McKnight was employed as a first-grade teacher at Wright Elementary School ("Wright"). The principal at Wright was O. W. Hamilton, Jr. ("Hamilton"). McKnight alleges that, during her employment, she suffered intimidation and abuse by co-workers at Wright, particularly by L'Davia Williams ("Williams"), and by the former Superintendent Johnson.

Although McKnight's recitation of facts has differed greatly, she has consistently alleged that on October 7, 2005, she suffered an assault by both Williams and Johnson and she responded by stabbing Johnson with a pair of scissors, either in the neck or in the mouth.

During her final year of employment, McKnight was permitted to take 100 sick leave days to seek medical treatment. As support for her need for leave, McKnight presented a Physician's Statement form completed on November 7, 2005, by her personal physician, Dr. Aruna Gullapalli. Dr. Gullapalli states that, at that time, McKnight was suffering from "Major depression, single episode with psychotic features." [Doc. No. 90, Exh. B5D]. She received in-patient treatment for the months of November and December 2005. According to the notes from a December 15, 2005 group therapy session, McKnight had "flashbacks" to incidents with her co-workers, but was aware that her claims against her co-workers were "all in her head." [Doc. No. 90, Exh. E].

Despite complaints to numerous agencies and an investigation by the Federal Bureau of Investigation ("FBI"), McKnight has produced no witness or evidence to corroborate her account of the alleged assaults and other actions taken against her. It is undisputed that Johnson had no

2

physical injuries consistent with the stabbing McKnight described.

McKnight was not terminated by the School Board and was never told that she would be terminated, but she resigned her position, effective May 31, 2006.

McKnight did not report Johnson's alleged attack at any time prior to her resignation.

On January 5, 2007, McKnight filed her Complaint [Doc. No. 1]. McKnight named the School Board, ABC Insurance Company, and Johnson as Defendants.

Three months later, McKnight's attorney withdrew, and she has proceeded *pro se.*

On May 12, 2008, McKnight was permitted by the Magistrate Judge in a conference to orally amend her Complaint to substitute Lexington Insurance Company and National Union Fire Insurance Company for ABC Insurance Company.

On September 23, 2008, after six extensions of time, the Court dismissed McKnight's claims against Johnson for failure to obtain service.

On January 5, 2009, after notice to McKnight, the Court also dismissed the claims against the two insurers for failure to obtain service.

On April 3, 2009, the remaining Defendant, the School Board, filed the pending Motion for Summary Judgment. McKnight has filed two memoranda in response.

The Court is now prepared to rule.

## II. LAW AND ANALYSIS

### A. Summary Judgments

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. FED.

R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party can meet its initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The Court is to resolve actual controversies about the facts in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). In reviewing the facts, the Court must consider all of the evidence in the record but refrain from making any credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

"[H]owever, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). "When opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Anderson*, 477 U.S. at 248 (Summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.).

**B.     Desegregation Decree**

In her memoranda, McKnight makes reference to the long-standing desegregation decree

4

under which the School Board operates. *See Linda Williams, et al. v. George Kimbrough, et al.*, Civil Action No. 65-11329 (W.D. La. 1965). McKnight did not assert a claim in her Complaint based on the desegregation decree, has not attempted to intervene in that lawsuit, and would not have standing to intervene. *See* FED. R. CIV. P. 24(a)-(b) (intervention as of right and permissive intervention). Therefore, to the extent that McKnight has attempted to state a claim under the desegregation decree, that claim is, *sua sponte,* DISMISSED WITH PREJUDICE.

C. **Title VII**

1. **Race Discrimination and Sexual Harassment Claims**

McKnight did assert claims of race discrimination and sexual harassment in her Complaint.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of the individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination prohibited under Title VII. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393 (5th Cir. 2007).

With regard to a claim of race discrimination, a plaintiff who relies on circumstantial evidence of discrimination[1] must establish a *prima facie* case by showing that (1) she is a member of a protected class, (2) she is qualified for the position at issue, (3) she was subject to an adverse employment action, and (4) she was replaced by someone outside the protected class or that similarly situated individuals outside the protected class were treated more favorably. *See Okoye*

---

[1] A plaintiff may also rely on direct evidence of discrimination, but McKnight has not indicated that she does so in this case. Therefore, the Court applies the *McDonnell Douglas* burden-shifting test.

5

*v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (internal quotation marks and citations omitted).[2]

With regard to a claim for sexual harassment, a plaintiff must establish that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002). Based on the holdings of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), in circumstances where the alleged harasser is a supervisor with authority over the employee, the plaintiff need only satisfy the first four elements. *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). Under a hostile work environment theory of sexual harassment, the plaintiff is not required to show that she suffered a tangible employment action, but that the conduct of the alleged harasser was severe or pervasive enough to alter a term or condition of her employment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

In this case, the School Board concedes that McKnight belonged to protected classes as a Caucasian and as a woman. With regard to her claim of race discrimination, the School Board does not contest that McKnight can meet the second element by showing that she was at least

---

[2]The Court has determined, *infra*, that McKnight cannot establish her *prima facie* case. Thus, the Court did not reach the remainder of the burden-shifting analysis. If McKnight had met her initial burden, the burden of production would have shifted to the School Board to provide a "legitimate, nondiscriminatory reason" for any adverse action taken against her. *Okoye*, 245 F.3d at 512. Assuming the School Board met its burden of production, McKnight would have had the final burden to show that the proffered reason was pretext for discrimination or that "the defendant's reason, while true, [was] only one of the reasons for its conduct, and another 'motivating factor' [was] the plaintiff's protected characteristic." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal quotation marks and citation omitted).

6

minimally qualified for her position. However, the School Board contends that McKnight cannot meet her *prima facie* burden on either her race discrimination or her sexual harassment claim because she cannot show that she was the "victim of any wrongdoing," "somehow treated different[ly] from other employees," or was subjected to "unwelcome harassment."

In her 240-page deposition, McKnight alleges a lengthy series of alleged acts against her by other teachers and Johnson. However, the crux of her complaint and, by far, McKnight's most serious allegation is that she was physically attacked on October 7, 2005, by Williams in the presence of her principal, Hamilton, and Johnson. She alleges that Johnson responded by anally raping her in front of her first grade students while Williams assisted and Hamilton did nothing to intervene. McKnight testified in her deposition to the following scenario:

> Q: Well, what happened when y'all go back down to your classroom . . . on October the 7th?
>
> A: The door opened and [Williams] came in. And I was at my desk . . . She came in first, and Mr. Hamilton and Mr. Johnson kind of stood at the door, and Mr. Johnson came on in, and Mr. Hamilton, and she continued taunting me. She . . . chased me . . . around the room . . . So we wound up at the back of the room . . .
>
> Q: Were there any students in the room?
>
> A: Not at the time because they were at the library. She started taunting me again and she was kind of pushing and slapping again, and she was wrenching on my clothes . . . She said she was going to help me off the bridge and all this other stupid stuff, and she was taking a lick back, and it was easier for a white person on a camel to fit through the eye of a needle than a white person to go to heaven . . . And her pulling on my clothes . . . lasted until the children came back to the room . . . I really could not stand her being near me, but I couldn't get away from her. So I wound up basically on the floor, and I saw Mr. Johnson . . . rubbing himself . . . She wound up almost spitting on me, and I had kind of wiped it–I cannot stand that. And she was like, "Oh, you can't stand that," and that just seemed to . . . spur her on. . . . She wound up licking me.
>
> Q: Where did she lick you?

A: Just kind of up the face . . .

Q: And the kids were there?

A: By that time the kids had come back in, and Michael Johnson was standing there . . . I wound up sexually assaulted in the . . . butt.

. . .

A: . . . He opened [his pants] and he had about a five-inch erect penis. . .

Q: And the kids were in the room?

A: The kids were in the room at that moment . . .

Q: What happened next?

A: She had wrenched my arm around, and he had reached down to grab me, and he slid his hand on my bust. And I wasn't really looking at him at that point. I had curled back up in a ball. And I but just because it was another hand grabbing me, and he let go and he got mad, and he thumped me on my head, and when I looked up, he was holding his arm, and he grabbed me and he got behind me. And it was not necessarily very long, but I was . . . sexually assaulted. . . One of the children, I suppose–I really don't know how the scissors got there. They were under me. And I was screaming and screaming so that when I stood up I wound up having the scissors . . . stabbing him in the throat when he put his hands around my throat.

Q: Did it hurt him?

A: It must have because he bled a lot, I remember. . . . But it [the scissors] went in his mouth. It didn't cut like outside something like that.
. . .

Q: Did you ever go to a hospital to let them examine you?

A: I went home. I went home. I–I stopped screaming and turned around and the children were there, and they left and I left, and I went home and went to bed, and then I went to the doctor on Tuesday afterwards.

[Doc. No. 90, Exh. B, McKnight Depo., pp. 75-81]. When questioned why no child told his or her parent, McKnight did not answer the question directly, but responded that "[h]e[3] sent away

---

[3] It is not clear if McKnight refers to Hamilton or Johnson.

8

the police officer because I stood there screaming and screaming. He told the cop to go away and he reminded the cop that he could get like a . . . $5000 . . . bonus." [Doc. No. 90, Exh. B. McKnight Depo., pp. 81-82].

McKnight also alleged in her Complaint that Johnson "and others physically touched and threatened her that if she pressed the issue of the assault" Johnson would have her fired and that the School Board would not listen to her complaints because Johnson knew of "nefarious activity" of School Board members. [Doc. No. 1, ¶ 21]. It is undisputed that McKnight did not report Johnson's alleged conduct prior to her resignation.

Over the course of the three and one-half years since McKnight was allegedly raped in front of her young students, she has not produced a single witness or any corroborating evidence to support her allegations. It simply defies belief that a person could be subjected to the violent attack she describes in front of a room full of students and the principal of the school and that no child reported the event to his or her parents, and no employee of Wright heard or saw anything. In fact, the School Board has obtained affidavits from Williams, Hamilton, and Jeannie Harrison, McKnight's teacher's aide, all of whom deny that any such events occurred.[4]

Additionally, not even McKnight has offered a consistent version of her alleged attack and the other harassment and discrimination she alleges she suffered at Wright. McKnight made

---

[4]In her Complaint, McKnight also alleged that an African-American co-worker "distributed bottles of White-Out" to McKnight's students with the instruction to take the bottles home to their parents to help get "'the White out of Wright.'" [Doc. No. 1, ¶ 22]. Other than her own assertion, McKnight has produced no evidence that this event took place either. Harrison also denies seeing or hearing anything that lends credence to this allegation. Even if the teacher had taken this action, McKnight has not asserted a claim for racial harassment, only discrimination, and she has not alleged that the teacher's actions resulted in an adverse action against her by the School Board. Finally, as the School Board points out, McKnight's only claims in her EEOC charge are that she was subjected to assaults, and, thus, she has not exhausted her administrative prerequisites as to other generalized discriminatory actions.

9

complaints to the United States Department of Education ("DOE"), the DOE Office of Civil Rights ("OCR"), the FBI, the Louisiana State Police, the EEOC, and her health care providers. None of these agencies or providers found merit to her claims, but, more importantly, McKnight's version of events differed in each complaint.

McKnight first sought treatment at the Delhi Rural Health Clinic on October 11, 2005, the Tuesday after the alleged attack occurred. At that time, she informed her provider that she had been attacked by a teacher and injured her shoulder. She did not say that she was raped.

McKnight's reports to investigative agencies are also inconsistent. In her November 22, 2005 report to the DOE, she reports that she was pinched and choked, not raped. In two different interviews with FBI Agent Robert Robichaux, McKnight gave different stories: in the first interview, she was beaten and fondled by Williams while Johnson watched, fondled himself with his pants zipped, and then also choked her. She alleged stabbed him in the neck with sewing scissors. In a second interview, after Agent Robichaux interviewed Johnson and observed no scars or marks on his neck, McKnight alleged that she stabbed him in the mouth after he exposed his penis and fondled himself. McKnight never alleged that she was raped. In her EEOC charge, however, McKnight alleged that she was sexually and physically assaulted by Johnson. Finally, in a letter to the Louisiana State Police, McKnight describes how Williams took the scissors after McKnight stabbed Johnson in the throat and then Williams attacked her with the scissors until Hamilton protected McKnight by moving her behind him.

In November and December 2005, McKnight began seeking treatment for mental illness. On November 3, 2005, Delaine Harris of the Delhi Rural Health Clinic referred McKnight to Solutions Behavioral Health Hospital ("Solutions") for evaluation and treatment for delusional and disorganized thoughts and labial moods. On November 7, 2005, McKnight was admitted

into Solutions for psychiatric treatment. She was treated in-patient at Solutions until December 29, 2005. During her treatment she alleged varying stories about the events, but, on at least two occasions, admitted that she might have a problem with perception and was aware that she was delusional. Upon release from Solutions, the discharge summary stated that McKnight was paranoid, but did "not see anything paranoid about her thoughts."[5] [Doc. No. 90, Exh. E].

Finally, in her own May 13, 2008 deposition, McKnight recounted the events set forth above and testified that the police later began harassing her for making false 911 calls. On one occasion, she contends that the police called Johnson down to the police station or office where the police officers pulled up the top and then pulled down the bottom of her clothes. [Doc. No. 90, Exh. B, McKnight Depo., pp. 193, 200].

Ultimately, however, McKnight admitted that her own physicians question whether these events occurred. She then testified

> . . . with Dr. Gullapalli [her physician at Solutions], they almost had me to the point where I almost would believe them. My mother would have me believe that I had been locked in a mental institute and that was part of the problem. This–this has gotten so strange and so bizarre. This is to the point that I've had–I mean, it really is out there.

[Doc. No. 90, Exh. B., McKnight Depo., p. 222].

It is highly unusual that the Court would grant summary judgment when a plaintiff testifies under oath in a deposition to facts that appear to contradict the evidence presented by the moving party. The Court is well aware of its duty not to weigh evidence or to judge the credibility of witnesses. However, in this case, the Court is faced with McKnight's own varied

---

[5] This is not the first time that McKnight has alleged that she was the victim of a sexual attack. In September 2004, McKnight alleged that she was the victim of a sexual attack to a physician at the Delhi Rural Health Clinic, but denied knowing what the alleged rapist looked like and denied reporting the attack to the police. McKnight did test positive at that time for Hepatitis C, for which she continues to receive treatment. [Doc. No. 90, Exh. E].

11

accounts of the alleged discriminatory and harassing actions against her and objective, medical evidence indicating that her perception of reality is altered–a fact that McKnight has, on occasion, acknowledged. Combined with McKnight's inability to present any corroborating witnesses or other evidence and the clear contradictory evidence presented by the School Board, this is the rare case where a party's version of events is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. McKnight has not raised a genuine issue of material fact for trial, and the School Board's Motion for Summary Judgment on her claims of race discrimination and sexual harassment is GRANTED.

    **3.**    **Retaliation**

McKnight also asserts a claim of retaliation under Title VII. Title VII prohibits an employer from discriminating against an employee because she has opposed an employment practice that is unlawful under Title VII or testified in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a).

Retaliation claims under Title VII are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). To establish a *prima facie* case of unlawful retaliation, McKnight must show: (1) that she engaged in protected activity; (2) that she was subjected to a materially adverse employment action; and (3) that there is a causal connection between the protected activity and the materially adverse employment action. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).

The School Board moves for summary judgment on the second prong, whether McKnight was subject to a materially adverse employment action. The undisputed evidence provided by the School Board shows that McKnight was permitted to take 100 days of sick leave during her last year of employment, though she was only entitled to take 11 days. [Doc. No. 90, Exh. Aff. of

Vickie Keys and attached attendance records]. Further, when she did not return to work, she was not terminated, but was placed on leave without pay. McKnight's employment ended with her resignation, not an action by the School Board. Thus, she cannot show that she suffered a materially adverse action.

Even if McKnight could meet this burden, McKnight cannot establish a causal connection to any protected activity. She did not sign her Charge of Discrimination with the EEOC until May 29, 2006, right before her resignation. There is no evidence that the School Board had notice of her filing and took a materially adverse action against her between that date and her resignation.

The School Board's Motion for Summary Judgment on McKnight's retaliation claim is also GRANTED.

### D. State Law Claims

McKnight also asserts certain state law claims against the School Board. She asserts that the School Board is vicariously liable for Johnson's actions on her claims of intentional and negligent infliction of emotional distress and assault and battery. She further asserts that the School Board is directly liable for its negligent hiring, supervision, and retention of Johnson.

#### 1. Vicarious Liability Claims

Louisiana Civil Code article 2320 provides that "employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Article 2320 further provides that "responsibility only attaches, when the . . . employers . . . might have prevented the act which caused the damages, and have not done it." LA. CIV. CODE ART. 2320.

A claim of intentional infliction of emotional distress is brought under Louisiana Civil

13

Code article 2315, the article governing negligence actions. *See* LA. CIV. CODE ART. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."). This cause of action was first recognized in *White v. Monsanto*, 585 So.2d 1205 (La. 1991). In that case, the Louisiana Supreme Court explained:

> One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> Thus, in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*Id.* at 1209-10 (internal citations omitted).

Similarly, to prevail on a claim for negligent infliction of emotional distress, a plaintiff must show that (1) the defendant's conduct is negligent and (2) such conduct caused mental disturbance accompanied by physical injury, illness, or other physical consequences. *See Moresi v. State, Through Dept. of Wildlife and Fisheries*, 567 So.2d 1081, 1095 (La. 1990).

Under Louisiana law, a battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact . . . ." *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987). An assault occurs where one person threatens another and the threatening person has the present ability to carry out those threats so that the person threatened is "placed in reasonable apprehension of receiving an injury." *Johnson v. English*, 34-322 (La. 5 Cir. 12/20/2000); 779 So.2d 876, 880.

In *Baumeister v. Plunkett*, 673 So.2d 994 (La. 1996), the Louisiana Supreme Court considered whether a hospital was vicariously liable for the sexual assault of its employee, the plaintiff, Baumeister, by her supervisor, Plunkett. The Court stated as follows:

> The law in this area is clear that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment. *Orgeron v. McDonald*, 93-1353 (La. 7/5/94), 639 So.2d 224, 226. The course of employment test refers to time and place. *Benoit v. Capitol Manufacturing Co.*, 617 So.2d 477, 479 (La.1993). The scope of employment test examines the employment-related risk of injury. *Id.*

673 So.2d at 996. However, "'[a]n employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours.'" *Id.* (quoting *Scott v. Commercial Union Ins. Co.*, 415 So.2d 327, 329 (La. App. 2d Cir.1982)) (other citations omitted). Rather, "'[v]icarious liability will attach in such a case only if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective.'" *Id.* (quoting *Scott*, 415 So.2d at 329). The Louisiana Supreme Court considers four factors: (1) whether the tortious act was primarily employment rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment. *Id.* at 997 (citing *LeBrane v. Lewis*, 292 So.2d 216, 217, 218 (La.1974)).

Although Baumeister was sexually assaulted at the hospital during her work hours (and those of Plunkett), the Louisiana Supreme Court found that the hospital was not liable:

> Neither the first nor second *LeBrane* factors, however, existed in this case. Regarding the incident to performance of duties factor, a supervisor may foreseeably become involved in a dispute with a "recalcitrant underling." *LeBrane*, 292 So.2d at 217. It is also quite foreseeable and reasonably incidental to the employee[']s duties that security guards and doormen may fight with unruly patrons... The likelihood, on the other hand, that a nursing supervisor will find an employee alone in the nurses' lounge and sexually assault her is simply not a risk fairly attributable to the performance of the supervisor's duties. A nursing supervisor's responsibilities do not include sexually oriented physical contact with a co-employee. And it is not at all foreseeable from the perspective of the hospital that such conduct will take place on hospital premises during working hours... We conclude that Plunkett's actions were not reasonably incidental to the performance of his employment duties.

15

*Id.* The Court also found that Baumeister failed to establish that Plunkett's tortious act was primarily employment rooted. *Id.*

Likewise, in this case, even if Johnson did sexually assault McKnight with the assistance of her co-worker, McKnight has not presented the Court with facts to show that it was foreseeable and reasonably incidental to his duties that Johnson, the superintendent of all the schools in Madison Parish, would go to a first-grade teacher's classroom and sexually assault her, with the assistance of another teacher, and in the presence of a room full of first graders. Thus, even if the assault took place, Johnson's actions were not reasonably incidental to the performance of his employment duties.

The School Board's Motion for Summary Judgment on McKnight's claims of negligent and intentional infliction of emotional distress and assault and battery is also GRANTED.

### 2. Negligent Hiring, Supervision, and Retention

Finally, McKnight asserts a claim against the School Board for the negligent hiring, supervision, and retention of Johnson.

Generally, a claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee is governed by the duty-risk analysis used for negligence cases. *Griffin v. Kmart Corp.*, 00-1334 (La. App. 5 Cir. 11/28/00); 776 So.2d 1226, 1231. If an employer hires an employee who, in the performance of his duties, will have a unique opportunity to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee. *Id.*

In this case, McKnight has presented no evidence that Johnson had such a unique opportunity or that the School Board had learned of information prior to the alleged assault on

16

McKnight placing it on notice that Johnson had some criminal propensity. Again, Johnson's alleged assault on McKnight supposedly took place during the school day, in the presence of adults and children. McKnight's contentions, even if supported by any evidence, do not establish a duty on the School Board's part to protect her from the particular harm that occurred.

The School Board's Motion for Summary Judgment on this claim is also GRANTED.

## III. CONCLUSION

For the foregoing reasons, the School Board's Motion for Summary Judgment is GRANTED, and McKnight's claims are DISMISSED WITH PREJUDICE. To the extent that McKnight attempts to assert a claim based on the desegregation decree under which the School Board operates, that claim is also DISMISSED WITH PREJUDICE. All other pending motions are DENIED AS MOOT.

MONROE, LOUISIANA, this 20th day of May, 2009.

*Robert G. James*
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE